**UNITED STATES DISTRICT COURT**

**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **ROSEDELMA SERAPHIN, an individual,** | |
| **Plaintiff,** | **C.A. No. 1:26-cv-** |
| **v.** | |
| **BROWN UNIVERSITY** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

## COMPLAINT

## I. SUMMARY OF THE ACTION

1. Plaintiff Rosedelma Seraphin ("Rosedelma" or "Plaintiff") brings this action against Brown University ("Brown" or "Defendant") for discrimination and retaliation arising from her employment and termination. After Rosedelma took medical leave for a disabling condition, Brown required her to return, placed her on a performance improvement plan the following day, and terminated her before the promised review period ended. The challenged treatment also followed her participation in Black Women @ Brown and advocacy concerning race- and sex-based compensation disparities.

2. Plaintiff seeks compensatory, liquidated, and punitive damages, counsel fees and costs, and equitable relief under the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 *et seq.*; the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 *et seq.*; the Rhode Island Civil Rights of People with Disabilities Act ("RICRPDA"), R.I. Gen. Laws § 42-87-1 *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Rhode Island Parental and Family Medical Leave Act ("RIPFMLA"), R.I.

Gen. Laws § 28-48-1 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and 42 U.S.C. § 1981 ("Section 1981").

## II. PARTIES

3. Plaintiff is a citizen and resident of North Providence, Rhode Island.

4. Brown is a Rhode Island nonprofit corporation with its principal place of business in Providence, Rhode Island. Brown operates the Warren Alpert Medical School and employed Plaintiff within its Division of Biology and Medicine.

5. At all relevant times, Brown employed at least 501 employees and was Plaintiff's employer within the meaning of the applicable statutes.

## III. JURISDICTION

6. This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's federal claims and supplemental jurisdiction under 28 U.S.C. § 1367 over her related state claims, which arise from the same employment relationship and challenged conduct.

7. This Court has personal jurisdiction over Brown because it is incorporated and maintains its principal place of business in Rhode Island.

## IV. VENUE

8. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Brown resides in this District and a substantial part of the events giving rise to this action occurred here.

## V. MATERIAL FACTS

9. Rosedelma began working for Brown in or around August 2019 as Assistant Director of the Office of Diversity and Multicultural Affairs ("ODMA"). Her supervisor was Dr. Joseph Diaz, then Associate Dean for Diversity and Multicultural Affairs.

10. Rosedelma developed and managed programming, recruitment and community partnerships; administered budgets; supervised administrative personnel; and supported medical students, residents, faculty, and trainees. Her programs included the Virtual Residency Recruitment Fair, Black Men in White Coats Summit, and mentorship and affinity-group initiatives.

11. Under Dr. Diaz, Rosedelma received positive performance feedback. Her 2022 evaluation rated her performance as "Exceptional," and Brown selected her for an Administrative Award in or around March 2021. Before the events described below, she had never received any disciplinary warnings.

12. In 2022, Brown restructured ODMA into the Office of Belonging, Equity, Diversity and Inclusion ("OBEDI"), creating separate centers for Student Belonging and Workforce Development, Recruitment and Retention.

13. During the summer of 2022, including on July 7, 2022, Dr. Patricia Poitevien ("Dr. Poitevien"), Senior Associate Dean for Diversity, Equity and Inclusion, began meeting with Rosedelma concerning the transition. On or about August 4, 2022, BioMed Human Resources notified Rosedelma that she would report to Dr. Poitevien.

14. At the same time as the transition, Brown audited Rosedelma's position and recognized that her work exceeded her existing job description. Effective September 1, 2022, Brown promoted her from Assistant Director, Grade 10, to Associate Director, Grade 11, and increased her annual salary from $75,000 to $90,000.

15. Brown subsequently assigned Rosedelma operational responsibilities across both the Center for Student Belonging and the Center for Workforce Recruitment and Retention. The revised October 2022 job description required her to manage both centers' daily operations

and work with their directors. She did not receive structured onboarding or training for the revised role.

16. OBEDI leadership included Dr. Poitevien, Dr. Joseph Diaz, Dr. Tracey Guthrie, Dr. Dioscaris “Dio” Garcia, and Francisco A. Hernandez. Dr. Guthrie directed the Center for Workforce Recruitment and Retention, and Dr. Garcia directed the Center for Student Belonging and served as a dotted-line supervisor to Rosedelma.

17. The department had approximately eleven employees, including Rosedelma, in the relevant period.

**Black Women at Brown and Compensation Advocacy**

18. Rosedelma is a Black Dominican woman and participated in the Black Women @ Brown affinity group before Dr. Poitevien became her supervisor. Dr. Poitevien is Black and Haitian.

19. Rosedelma and other group members raised concerns that Black women received lower compensation and titles than white counterparts while carrying greater responsibilities. The group’s leaders advocated to Brown’s senior leadership concerning those race- and sex-based disparities.

20. Brown arranged a review known as the “Black Women @ Brown Compensation review.” On October 17, 2022, Dr. Poitevien informed Rosedelma that she had received the results. Brown’s Compensation Office confirmed the promotion, Grade 11 classification, and salary adjustment in writing on October 21, 2022.

21. After the review, Rosedelma’s revised position required her to support and manage operations across two centers. On November 30, 2022, she wrote to Brown’s Vice President for Human Resources and Vice President for Institutional Equity and Diversity requesting a

further equity review. She explained that her responsibilities had expanded after the earlier assessment, while another full-time director led only one center, and requested consideration of a Grade 12 classification and Director title. She followed up on December 8, 2022.

22. Rosedelma also raised the expanded responsibilities and compensation with Dr. Poitevien, who told her she could request another review but conveyed that nothing would happen. Dr. Poitevien questioned why Rosedelma had not told her about her participation in Black Women @ Brown.

23. Following this advocacy, Dr. Poitevien scrutinized Rosedelma more closely and publicly questioned her contributions in ways she had not experienced under Dr. Diaz.

24. Knowing that Rosedelma was Dominican, Dr. Poitevien made workplace comments about tensions between Haitians and Dominicans, stating in substance that the groups "do not get along."

25. In the context of their deteriorating working relationship, the comment conveyed that Rosedelma's national origin was an obstacle to their ability to work together. Rosedelma felt demeaned and unwelcome. As a Black Dominican woman working in an office responsible for belonging, equity, diversity, and inclusion, she found the use of her national origin to suggest that she and her supervisor could not get along particularly humiliating.

**First PIP**

26. On or about May 9, 2023, Brown presented Rosedelma with a negative evaluation and her first Performance Improvement Plan ("First PIP"). This was the first formal disciplinary action she had received during approximately four years at Brown and followed her compensation and equity advocacy.

27. The First PIP criticized her job knowledge, reliability, accountability, and communication. It cited a July 7, 2022, supervisory-transition meeting, an August 1, 2022, retreat, and an October 5, 2022, meeting as prior performance counseling.

28. The July 7 meeting was Rosedelma's first meeting with Dr. Poitevien concerning the transition. Rosedelma still reported to Dr. Diaz, and the discussion concerned her job description, restructuring, compensation, programs, and professional goals. Dr. Poitevien did not tell her that the meeting constituted performance counseling or discipline.

29. Brown also criticized her preparation for the retreat, the Virtual Residency Recruitment Fair, and the Student National Medical Association Annual Medical Education Conference ("SNMA AMEC"). Rosedelma had received the retreat agenda shortly before the event and was handling her grandmother's death. She nevertheless prepared and participated. For the recruitment fair and conference, she coordinated with the Administrative Coordinator, prepared materials, identified coverage and transportation arrangements, and communicated about her absence.

30. The First PIP also criticized her support for the Brown Minority Housestaff Association ("BMHA"). Rosedelma had managed BMHA's financial gift fund, maintained communications, invited its representatives to OBEDI meetings, and coordinated programming with its leadership.

31. The First PIP set a 30-to-60-day evaluation period and identified expectations concerning programming, budgets, meeting materials, stakeholder communications, and planned absences. It identified biweekly meetings with Drs. Guthrie and Garcia and access to training as resources.

32. Rosedelma promptly challenged the First PIP with Human Resources, including its characterization of earlier meetings as performance counseling. After reviewing the matter, Brown converted the PIP into a less formal expectations memorandum and removed its disciplinary nature and timeline.

33. Rosedelma complained to Human Resources and OBEDI leadership that the negative evaluation and discipline followed her compensation and equity advocacy and were inconsistent with her prior performance record.

34. On June 7, 2023, scheduled meetings with Brown's vice presidents and Dr. Poitevien were canceled without notice. These meetings were set up in response to Rosedelma's complaint and the cancellations left Rosedelma's concerns unresolved, increasing her sense of isolation within the department. Five days later, she began her first approved medical leave.

**Disability and First Medical Leave**

35. During the relevant period, Rosedelma was treated for adjustment disorder and received continuing medical care and therapy. The condition caused difficulty interacting with others, organizing her thoughts, and completing usual self-care, and substantially limited major life activities, including thinking, interacting with others, and caring for herself. Her symptoms also affected her ability to attend work and perform her usual duties, requiring periods of medical leave.

36. By June 2023, the ongoing workplace treatment was causing Rosedelma significant stress. On or about June 12, 2023, she began approved FMLA leave for her medical condition and remained out for approximately twelve weeks.

37. Brown's Leave Administration advised her on August 28, 2023, that it had reviewed medical documentation indicating that she should remain out through September 1, 2023. She returned in September 2023 and was permitted to work remotely approximately two days per week for a period.

38. Following her return, Brown issued a deliverables memorandum addressing recruitment events, the Virtual Residency Recruitment Fair, and affinity-group programming. On or about September 25, 2023, Rosedelma began reporting directly to Dr. Guthrie. Dr. Poitevien nevertheless remained involved in the later disciplinary actions.

39. Meetings following Rosedelma's return continued to focus on perceived deficiencies. Rosedelma sought clarification about responsibilities that had changed during restructuring and continued raising concerns about the evaluation of her performance.

40. On November 17, 2023, Rosedelma met with Dr. Garcia, who told her that negative performance reviews from Dr. Poitevien, Dr. Guthrie, and himself were forthcoming. Dr. Garcia also expressed frustration with management's approach. He did not agree that Dr. Poitevien should remain involved in evaluating and criticizing her performance given that she was no longer Rosedelma's direct supervisor.

41. The prospect of further negative evaluations increased Rosedelma's fear that she was being targeted for additional discipline and termination. Following her return from medical leave, she continued to experience scrutiny and criticism rather than an improvement in her working environment. These circumstances intensified her workplace stress in the months following her first medical leave.

42. Dr. Poitevien's treatment of Rosedelma differed from her warmer treatment of other colleagues. She recognized Dr. Anne Vera Cruz's personal milestones and interacted with her

socially; Dr. Vera Cruz was also permitted flexibility, including remote work and bringing her child to work. When both women had been away from the office, Dr. Poitevien publicly welcomed Dr. Vera Cruz back but did not acknowledge Rosedelma's return from extended medical leave.

43. Dr. Vera Cruz told Rosedelma that she attended gatherings at Dr. Guthrie's home with Dr. Poitevien and a limited group of colleagues, and that Rosedelma was discussed negatively there. Rosedelma did not attend those gatherings or hear the statements herself.

44. Dr. Poitevien also joked and spoke casually with Courtney, the Administrative Coordinator, and recognized her engagement or marriage. By contrast, she generally spoke to Rosedelma only during scheduled meetings and did not acknowledge her obtaining a doctoral degree, although other colleagues celebrated it.

45. When Rosedelma and Luckson Omoaregba were both selected for an outside health-equity opportunity, Dr. Poitevien publicly congratulated only Mr. Omoaregba until he pointed out Rosedelma's selection. Rosedelma was later told she could not participate, while Mr. Omoaregba was permitted to do so.

**Second Medical Leave and Brown's Knowledge of Her Condition**

46. On March 16, 2024, Rosedelma notified Brown that she needed medical leave beginning March 18th. Brown approved the leave, and she stopped performing her regular duties during the absence.

47. In a letter dated April 2, 2024, Brown identified the initial portion of the leave as RIPFML and stated that her RI/FMLA leave entitlement had been exhausted on March 22, 2024. Brown identified subsequent leave as an accommodation under the ADA and its leave policies. Rosedelma also requested an extension on March 26, 2024.

48. In response, Brown requested information from her treating provider about her impairment, affected job functions, alternative accommodations, and anticipated return date. Brown opened an accommodation claim and directed her to submit the medical response to its accommodation administrator.

49. On April 5, 2024, Kayla Cross, NP, documented that Rosedelma's adjustment disorder caused difficulty interacting with others, organizing thoughts, and completing usual self-care. NP Cross explained that difficulty interacting with others prevented Rosedelma from attending work and that no alternative accommodation would then permit her return.

50. NP Cross further confirmed that Rosedelma was receiving medically advised and monitored treatment with close follow-up. She anticipated a return on May 1, subject to reassessment of fitness for duty. The medical response was transmitted to Brown's accommodation administrator on April 5, 2024.

51. On April 23, 2024, NP Cross advised that Rosedelma should remain out of work until at least May 20, 2024, and would be assessed for fitness to return to her usual duties before that time.

52. In a letter dated May 8, 2024, Brown again stated that FMLA and/or RIPFML entitlement had been exhausted on March 22nd. It recognized medical leave as an ADA accommodation, although it listed an extension only through May 1st and an anticipated return of May 2nd. The letter instructed Rosedelma regarding medical clearance, restrictions, and requests for additional accommodation.

53. Brown therefore knew that Rosedelma had a medical impairment affecting her ability to work, was receiving continuing treatment, and had requested and received disability-related leave.

**Brown Required Her Return and Issued a Second PIP**

54. While on leave, Rosedelma pursued an internal Director of Special Projects position in the Office of the Provost. She had confirmed with Human Resources that she could apply and interview for other Brown positions during medical leave.

55. Brown selected her for multiple interview rounds. On May 14, 2024, she attended a full-day final-round interview on campus.

56. After learning of the interview, Human Resources questioned how she could participate while unable to perform her regular job and told her that her participation meant she could return to work. Brown required her to return immediately, despite the medical documentation identifying the need for leave and assessment of her ability to perform her usual duties.

57. Rosedelma returned on Monday, May 20, 2024, to remain employed and avoid jeopardizing the position for which she had interviewed.

58. On May 21, 2024, the day after Rosedelma returned from medical leave, Dr. Poitevien and Dr. Guthrie met with her and Human Resources and presented a second Performance Improvement Plan ("Second PIP"). Although Dr. Poitevien had ceased being her direct supervisor approximately eight months earlier, she issued the Second PIP immediately upon Rosedelma's return. Dr. Guthrie had been Rosedelma's direct supervisor since September 2023.

59. Dr. Poitevien therefore remained actively involved in imposing discipline on Rosedelma after the supervisory change and brought forward a new PIP before Rosedelma had a meaningful opportunity to resume her duties. The plan criticized job knowledge, reliability,

accountability, and communication based on earlier events rather than a period of observed performance after her return from approximately two months of medical leave.

60. That afternoon, Rosedelma emailed her treating therapist, Susan Estrela, MSW, LICSW, describing Brown's demand that she return following the interview and the PIP meeting that morning. She reported that the plan distorted events, threatened her career at Brown, and was extremely demoralizing and stressful.

61. On May 22, 2024, Rosedelma also wrote to President Christina Paxson. She explained that she had needed another leave because of the ongoing workplace treatment and had been placed on a PIP on her second day back. She requested support and raised concerns that the plan misrepresented her performance and could harm her opportunity to obtain the internal position.

62. On May 23, 2024, Rosedelma learned that she had not been selected for the Director of Special Projects position. She continued working in her existing role.

**Performance Criticisms and Rosedelma's Response**

63. The Second PIP criticized registration for the 2024 SNMA AMEC conference, citing a December 7, 2023, early-registration deadline and asserting that Rosedelma failed to communicate after learning on December 14th that she could not attend. These cited events occurred months before her March 2024 leave and May return.

64. In her May 31, 2024, written response to Drs. Poitevien and Guthrie, with Human Resources copied, Rosedelma explained that late budget approvals and miscommunications outside her control affected registration. Brown used approximately the same registration timeframe as in prior years, but the conference sold out earlier than anticipated. She had sought clarification and approval in advance.

65. For the Howard Recruitment Fair, Brown criticized her reliance on colleagues concerning tables, budget, participating programs, and attendance. For the AAMC Nickens Award nomination process, it criticized her requests for clarification about responsibility and approval of a proposed selection process. These requests arose while responsibilities were changing through restructuring before her first medical leave.

66. For BMHA, Brown criticized her concern about a meeting without an agenda and her inquiry about support from the Lifespan DEI Committee, treating them as an attempt to relinquish responsibility. Rosedelma had an established relationship with BMHA and had managed its funding, communications, and programming; she sought collaboration and clarification concerning support.

67. Rosedelma's May 31st response also explained that she had managed budgets, shared information with newly hired directors, and involved employees with relevant financial and institutional knowledge. She submitted leave requests through Workday for supervisory approval and remained accessible when performing remote work or work outside ordinary hours.

68. Rosedelma requested an unbiased review, constructive feedback, reasonable notice and agendas for Human Resources meetings, and assistance without retribution. She remained committed to the position and explained that she had not received the resources and professional development needed to address Brown's criticisms.

**Termination Before the Promised Review Period Ended**

69. The Second PIP promised a thirty-day evaluation period through June 21, 2024, with an employment determination on or about July 5, 2024. It required a final written response and identified deliverables by June 7th.

70. Rosedelma submitted the required response and deliverables on or about June 7, 2024, and participated in meetings concerning the plan.

71. On June 14, 2024, Brown terminated her employment, twenty-five days after her return and twenty-four days after issuing the Second PIP.

72. Brown terminated her seven days after she submitted the required deliverables, one week before the stated evaluation period ended, and three weeks before the anticipated decision date. It denied her the full opportunity it had promised to demonstrate improvement.

**Pretext**

73. Brown's stated performance reasons were a pretext for discrimination and retaliation. Under her former supervisor, Brown had rated her performance "Exceptional" and recognized her contributions. Brown also promoted her following a review of her expanded responsibilities. Human Resources later removed the First PIP's disciplinary timeline after Rosedelma challenged its characterization of earlier meetings as performance counseling. Brown nevertheless continued to rely on criticisms that omitted the restructuring, changing responsibilities, and communications supporting her work.

74. The timing and source of the Second PIP further demonstrate pretext. Brown required Rosedelma to return after learning that she had interviewed for another position while on medical leave. The following day, Dr. Poitevien issued a new PIP despite no longer being her direct supervisor. Brown relied on historical criticisms before Rosedelma had an opportunity to demonstrate her performance after returning, and escalated that discipline to termination within twenty-five days of her return.

75. Brown also departed from the evaluation process it expressly promised. It required deliverables by June 7th, represented that Rosedelma would have through June 21st to demonstrate improvement, and anticipated an employment determination on or about July 5th.

Rosedelma submitted the required work, but Brown terminated her on June 14th. Ending her employment before the promised review period expired, together with the immediate PIP and Dr. Poitevien's continued biased involvement, demonstrates that the plan was used to support her removal rather than provide the stated opportunity to improve.

76. Brown subjected Rosedelma to the Second PIP and terminated her because of her disability and in retaliation for requesting and taking protected medical leave and disability accommodations. The challenged disciplinary treatment also followed her advocacy concerning the treatment and compensation of Black women at Brown.

**Harm**

77. As a direct and proximate result of Brown's discriminatory and retaliatory conduct, Rosedelma lost wages, employment benefits, and other compensation and suffered damage to her professional standing.

78. Rosedelma also suffered emotional distress, humiliation, and other compensable harm. The treatment that required medical leave was compounded by Brown's demand that she return, the immediate imposition of the Second PIP, and her subsequent termination. Her contemporaneous communications with her therapist described the resulting stress, demoralization, and concern for her career.

## VI. ADMINISTRATIVE REMEDIES

79. On January 21, 2025, Plaintiff dual-filed a Charge of Discrimination against Brown.

80. On July 21, 2026, RICHR issued Plaintiff a right-to-sue notice. On September 16, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.

81. Plaintiff timely exhausted the administrative remedies required for her Title VII, ADA, and FEPA claims and satisfied the applicable preconditions to filing this action.

## VII. CAUSES OF ACTION

82. Plaintiff realleges and incorporates by reference paragraphs 1 through 81, inclusive, in each count below as if fully set forth therein.

**Count One**

*Disability Discrimination, Failure to Accommodate, and Retaliation/Interference*
*The Americans with Disabilities Act of 1990,*
*42 U.S.C. § 12101 et seq.*

83. Plaintiff was a qualified individual with a disability who could perform the essential functions of her position with reasonable accommodation, including finite medical leave for treatment and recovery. Brown knew of her disability and requests for accommodation. Defendant, by its acts and/or omissions, including those described herein, discriminated against Plaintiff because of her disability, failed to reasonably accommodate her need for medical leave, interfered with her exercise of rights, and retaliated against her for requesting and taking disability-related leave, including by requiring her immediate return based on her participation in an interview, imposing the Second PIP upon her return, and terminating her employment. Defendant thereby deprived Plaintiff of rights secured under the ADA and caused her to suffer damages as aforesaid.

**Count Two**

*Disability Discrimination, Failure to Accommodate, and Retaliation*
*The Rhode Island Fair Employment Practices Act,*
*R.I. Gen. Laws § 28-5-1 et seq.*

84. Plaintiff was a qualified individual with a disability who could perform the essential functions of her position with reasonable accommodation, including finite medical leave for treatment and recovery. Brown knew of her disability and requests for accommodation. Defendant, by its acts and/or omissions, including those described herein, discriminated

against Plaintiff because of her disability, failed to reasonably accommodate her need for medical leave, interfered with her exercise of rights, and retaliated against her for requesting and taking disability-related leave, including by requiring her immediate return based on her participation in an interview, imposing the Second PIP upon her return, and terminating her employment. Defendant thereby deprived Plaintiff of rights secured under the RIFEPA and caused her to suffer damages as aforesaid.

**Count Three**

*Disability Discrimination and Failure to Accommodate*
*The Rhode Island Civil Rights Act,*
*R.I. Gen. Laws § 42-112-1 et seq.*

85. Plaintiff was a qualified individual with a disability who could perform the essential functions of her position with reasonable accommodation, including finite medical leave for treatment and recovery. Brown knew of her disability and requests for accommodation. Defendant, by its acts and/or omissions, including those described herein, discriminated against Plaintiff because of her disability, failed to reasonably accommodate her need for medical leave, interfered with her exercise of rights. Defendant thereby deprived Plaintiff of rights secured under the RICRA and caused her to suffer damages as aforesaid.

**Count Four**

*Disability Discrimination, Failure to Accommodate, and Retaliation/Interference*
*The Rhode Island Civil Rights of People with Disabilities Act,*
*R.I. Gen. Laws § 42-87-1 et seq.*

86. Plaintiff was a qualified individual with a disability who could perform the essential functions of her position with reasonable accommodation, including finite medical leave for treatment and recovery. Brown knew of her disability and requests for accommodation. Defendant, by its acts and/or omissions, including those described herein, discriminated

against Plaintiff because of her disability, failed to reasonably accommodate her need for medical leave, interfered with her exercise of rights, and retaliated against her for requesting and taking disability-related leave, including by requiring her immediate return based on her participation in an interview, imposing the Second PIP upon her return, and terminating her employment. Defendant thereby deprived Plaintiff of rights secured under the RICRPDA and caused her to suffer damages as aforesaid.

**Count Five**

*Interference and Retaliation*
*The Family and Medical Leave Act,*
*29 U.S.C. § 2601 et seq.*

87. Plaintiff was an eligible employee of a covered employer, requested and took approved FMLA leave for a serious health condition, and exercised rights protected by the FMLA. Defendant, by its acts and/or omissions, including those described herein, interfered with those rights by using Plaintiff's exercise of protected leave rights as a negative factor in its disciplinary and termination decisions, and retaliated against her for requesting and taking FMLA leave. Upon information and belief, Defendant's violations were willful: Brown knew of Plaintiff's protected leave rights, administered and approved her leave, and knowingly or recklessly disregarded those rights in imposing discipline and terminating her employment. Defendant thereby violated the FMLA and caused Plaintiff to suffer lost compensation and benefits and other recoverable harm, for which she seeks relief.

**Count Six**

*Interference and Retaliation*

*The Rhode Island Parental and Family Medical Leave Act,*

*R.I. Gen. Laws § 28-48-1 et seq.*

88. Plaintiff was an eligible employee of a covered employer, requested and took approved RIPFMLA leave for a serious health condition, and exercised rights protected by the RIPFMLA. Defendant, by its acts and/or omissions, including those described herein, interfered with those rights by using Plaintiff's exercise of protected leave rights as a negative factor in its disciplinary and termination decisions, and retaliated against her for requesting and taking RIPFMLA leave. Upon information and belief, Defendant's violations were willful: Brown knew of Plaintiff's protected leave rights, administered and approved her leave, and knowingly or recklessly disregarded those rights in imposing discipline and terminating her employment. Defendant thereby violated the RIPFMLA and caused Plaintiff to suffer lost compensation and benefits and other recoverable harm, for which she seeks relief.

**Count Seven**

*Race and National Origin Discrimination and Retaliation*

*Title VII of the Civil Rights Act of 1964,*

*42 U.S.C. § 2000e et seq.*

89. Defendant, by its acts and/or omissions, including those described herein, discriminated against Plaintiff because of her race and national origin in the terms and conditions of her employment, including through discriminatory scrutiny, discipline, and termination. Plaintiff engaged in protected activity by participating in Black Women @ Brown's advocacy concerning race- and sex-based compensation and treatment disparities and by raising related concerns with Brown's leadership and Human Resources. Defendant knew of that activity. Defendant, by its acts and/or omissions, including those described herein, retaliated against Plaintiff because of her protected activity, including through increased

scrutiny, adverse performance evaluations, disciplinary actions, and termination. Defendant's conduct violated Title VII, deprived Plaintiff of rights secured thereunder, and caused her to suffer damages as aforesaid.

**Count Eight**

*Race and Ancestral Origin Discrimination and Retaliation*

*The Rhode Island Fair Employment Practices Act,*

*R.I. Gen. Laws § 28-5-1 et seq.*

90. Defendant, by its acts and/or omissions, including those described herein, discriminated against Plaintiff because of her race and country of ancestral origin in the terms and conditions of her employment, including through discriminatory scrutiny, discipline, and termination. Defendant's conduct violated FEPA, deprived Plaintiff of rights secured thereunder, and caused her to suffer damages as aforesaid. Defendant, by its acts and/or omissions, including those described herein, retaliated against Plaintiff for opposing practices she reasonably believed constituted unlawful race- and sex-based discrimination, including her advocacy through Black Women @ Brown and related complaints to Brown's leadership and Human Resources. Defendant's conduct violated FEPA, deprived Plaintiff of rights secured thereunder, and caused her to suffer damages as aforesaid.

**Count Nine**

*Race and Ancestral Origin Discrimination*

*The Rhode Island Civil Rights Act,*

*R.I. Gen. Laws § 42-112-1 et seq.*

91. Defendant, by its acts and/or omissions, including those described herein, discriminated against Plaintiff because of her race and country of ancestral origin, thereby interfering with her right to make and enforce her contract of employment and to enjoy its

benefits, terms, and conditions on equal terms. Defendant's conduct violated RICRA and caused Plaintiff to suffer damages as aforesaid.

**Count Ten**

*Race Discrimination and Retaliation*

*42 U.S.C. § 1981*

92. Defendant, by its acts and/or omissions, including those described herein, intentionally discriminated against Plaintiff because of her race and retaliated against her for opposing race-based disparities in compensation and treatment through Black Women @ Brown and related complaints to Brown's leadership and Human Resources. Plaintiff's race and, as to retaliation, her opposition to race discrimination were but-for causes of the respective adverse actions challenged herein. Defendant thereby interfered with Plaintiff's right to make and enforce her contract of employment and to enjoy its benefits, terms, and conditions on equal terms, in violation of 42 U.S.C. § 1981, causing her to suffer damages as aforesaid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays and respectfully requests that this Court grant the following relief:

A. A declaratory judgment declaring that the acts and/or omissions of Defendant, including, but not limited to those complained of herein, are in violation of the ADA, FEPA, RICRA, RICRPDA, FMLA, PFMLA, Title VII, and § 1981;

B. An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated;

C. An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, and other compensation and/or benefits, and to make

Plaintiff whole for all earnings and benefits Plaintiff would have received but for the violations;

D. An award of all actual, general, special, incidental, statutory, punitive, compensatory, liquidated, consequential, and/or restitutionary damages to which Plaintiff is entitled;

E. An award of prejudgment interest, reasonable attorneys' fees, and costs; and

F. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

**ODU LAW FIRM, LLC**

Dated: October 19, 2026

By: /s/ Olayiwola O. Oduyingbo

Olayiwola O. Oduyingbo, Esq.
RI Bar No. 9427
888 Reservoir Avenue, Floor 2
Cranston, RI 02910
Phone: (401) 209-2029
Fax: (401) 217-2299
odu@odulawfirm.com

**ATTORNEYS FOR PLAINTIFF,**
**ROSEDELMA SERAPHIN**